## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

COMMITTEE TO STOP AIRPORT EXPANSION,
c/o Edward Gorman
68 Huckleberry Lane
East Hampton, New York 11937

PAT TRUNZO, III
10 Cedar Trail
East Hampton, New York 11937

PAT TRUNZO, JR.
148 Buckskill Road
East Hampton, New York  11937

EDWARD GORMAN
68 Huckleberry Lane
East Hampton, New York 11937

                Plaintiffs,

          v.

DEPARTMENT OF TRANSPORTATION,
NORMAN Y. MINETA, SECRETARY OF
TRANSPORTATION, THE FEDERAL AVIATION
ADMINISTRATION, and MARION BLAKEY,
ADMINISTRATOR OF THE FEDERAL AVIATION
ADMINISTRATION,

                Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAY 27 2003 ★

BROOKLYN OFFICE

COMPLAINT

03 2634

SEYBERT, J

ORENSTEIN, M.J.

### INTRODUCTION

1.     Plaintiffs Committee to Stop Airport Expansion, Pat Trunzo, Jr., Pat Trunzo, III

and Edward Gorman ("Plaintiffs") bring this complaint to challenge a determination by

Defendants, made on August 20, 2001, to approve an airport layout plan ("ALP") for the East

Hampton Airport.  Defendants' August 20 approval of the ALP is in violation of its obligations

under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4335, the Airport

and Airways Improvement Act ("AAIA"), 49 U.S.C. §§ 47101-47131, and the Federal Aviation

Administration's own regulations, 14 C.F.R. Parts 151 and 152, relating to administration of the Airport Improvement Program ("AIP").

     2.     Plaintiffs request declaratory and injunctive relief requiring Defendants to refrain from approving any airport development projects and/or disbursing any federal funds to the Town of East Hampton, until Defendants have fully complied with NEPA, the Airport and Airways Improvement Act, and Federal Aviation Administration regulations.

JURISDICTION AND VENUE

     3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201-2202, and 5 U.S.C. §§ 701-706.  Venue is proper in this district under 28 U.S.C. § 1391(e) and 5 U.S.C. § 703.

PARTIES

     4.     The Committee to Stop Airport Expansion ("Committee") is an unincorporated association of persons who reside in the vicinity of the East Hampton Airport ("Airport").  The Committee is committed to restricting the uncontrolled growth of the Airport and is concerned about the environmental impacts that will result from its further expansion.  The Town of East Hampton has been significantly modifying the Airport, without benefit of public input or the requisite environmental review, since the adoption of the 1989 Master Plan Update.  The Committee brings this action on behalf of itself and its members who live near the Airport.

     5.     Plaintiff Pat Trunzo, III has been a full-time, year-round resident of the Town of East Hampton for 27 years and a member of the Committee to Stop Airport Expansion since its formation in 1998.  Mr. Trunzo, a former member of the Town Board of the Town of East Hampton, and his family reside at 10 Cedar Trail, East Hampton, New York.  The Trunzos' home is located approximately 2 miles northwest of the Airport.  Due to the proximity of his

2

home to the Airport, Mr. Trunzo is acutely affected by overflight activity stemming from Airport operations. Mr. Trunzo is particularly affected by on-airport noise generated from aircraft during engine run-ups and aircraft take offs, as well as from reverse-thrust noise produced by jet aircraft upon landing, all of which is audible from his home.

6.      Mr. Trunzo and his family suffer daily disruption of their home life due to the noise from the Airport. Routine activities such as outdoor dining and entertaining, gardening, and reading are disrupted by noise from aircraft taking off from and landing at the Airport. In addition, during the summer months, Mr. Trunzo is frequently awakened from a sound slumber by an increasing number of business jets utilizing the Airport. The disruption caused by the Airport noise is heightened by the fact that East Hampton is located in a quiet, rural setting, with little ambient noise, other than noise coming from the Airport. Indeed, Mr. Trunzo chooses to live in East Hampton because he enjoys the outdoors, and he believes the serene character of the historic village provides a pleasant and healthy environment for him and his family.

7.      Plaintiff Pat Trunzo, Jr. has been a resident of the Town of East Hampton for over twenty years and has been a member of the Committee to Stop Airport Expansion for several years. Mr. Trunzo resides at 148 Buckskill Road, East Hampton, New York, with his wife, Nancy. Because his home is located approximately 1.04 miles east of the Airport, directly in line with the main runway, Runway 10-28, his quality of life is directly impacted by overflight activity stemming from Airport operations. Mr. Trunzo is particularly affected by the visual and sound impact of aircraft on final approach to landing on Runway 28 and aircraft taking off from Runway 10.

8.      The more recent and increasingly frequent landings and departures of larger, more powerful aircraft, particularly multiple engine charter planes and business jets have become a

3

disturbing and disruptive presence in Mr. Trunzo's daily life. Because of their greater size and weight, these planes have multiple powerful engines and operate at higher flying speeds. The result is that they are lower and louder as they pass overhead on takeoffs and landings, and must operate from far greater distances from the Airport as they approach to land or climb to altitude upon takeoff. The jet aircraft also generate a great deal of noise even when they are on the Airport itself. Noise from engine "run-ups" or the pre-flight revving of aircraft engines to ensure safe operation is audible on Mr. Trunzo's property even though the Airport is over a mile away. The load roar produced by the reverse thrusting of jet aircraft after touch down to brake the plane before it reaches the end of the runway is also audible from Mr. Trunzo's property and many miles around.

9.     The impact of the noise generated by these aircraft on Mr. Trunzo's quiet enjoyment of his home is substantial. On weekends in the peak summer months of July and August, the noise is so frequent and intense as to be virtually intolerable. It disrupts many routine activities, such as conversing with family and guests, speaking on the telephone, watching television, or listening to the radio or stereo. In addition, the noise takes away from the pleasure and relaxation of Mr. Trunzo's outside patio and backyard. He avoids inviting guests or hosting family get-togethers during the summer months because the repeated noise from airplanes flying overhead or nearby is unpleasant. Moreover, the Trunzos' sleep is affected; Mr. Trunzo and his wife are often awakened by noise from low flying business jets landing and taking off late at night.

10.     Plaintiff Edward Gorman has lived in the Town of East Hampton for 22 years and has been a member of the Committee to Stop Airport Expansion since its inception in 1998. Mr. Gorman resides at 68 Huckleberry Lane, East Hampton, New York, which is part of the

4

Georgica Estates residential community. Mr. Gorman resides in East Hampton because of the quiet and restful outdoor environment it offers. Mr. Gorman especially enjoys the rural character, beauty, beaches, and tranquility of East Hampton.

11.     Because Mr. Gorman's home is located approximately 3/4 of a mile from the Airport, his quality of life is directly impacted by overflight activity stemming from Airport operations. Mr. Gorman is particularly affected by aircraft on final approach to landing on Runway 28, those taking off from Runway 10, and those circling to land on Runway 22. Moreover, Mr. Gorman is acutely affected by on-airport noise generated from aircraft during engine run-ups and aircraft take offs, as well as from reverse-thrust noise produced by jet aircraft upon landing, all of which is audible from the inside and outside areas of his home.

12.     The noise from the Airport interferes with many daily activities that take place in Mr. Gorman's home. Mr. Gorman, who is a writer and who works from his home office, often is distracted from his work by the noise from the Airport. Airport noise also interrupts telephone conversations, reading and gardening outdoors, and Mr. Gorman's outdoor luncheon parties. Over the years, East Hampton has become a popular tourist destination, significantly increasing the air traffic and the resulting Airport noise that interferes with Mr. Gorman's tranquil enjoyment of his home. As a result of the increase in air traffic, the Airport noise intensifies during the summer months, which is exactly when Mr. Gorman would like to garden, read, and dine outdoors.

13.     Members of the Committee, including the individually named plaintiffs, reside and own property in close proximity to the East Hampton Airport and are adversely affected by the noise, air pollution, visual impact, and additional traffic caused by the operation of the

Airport. As such, Plaintiffs have a direct interest in the present and future plans for use and development of the Airport.

14.    Defendants' approval of the airport layout plan for the Airport without any of the analysis of potential environmental impacts, as required by NEPA, increases the risk of present and future harm to the environmental and aesthetic interests of members of the Committee, including the individually named plaintiffs. Moreover, Defendants' failure to comply with NEPA deprives Plaintiffs of their procedural rights under NEPA.

15.    Defendants' failure to insure that their approval of the airport layout plan for the Airport, upon which grant eligibility determinations and environmental reviews of proposed projects are made, is current and shows the existing and planned layout of the airport has a direct impact on the environmental and aesthetic interests of members of the Committee, including the individually named plaintiffs, who live near the Airport and are affected by airport and aircraft operations.

16.    Pursuant to the AAIA, Defendant United States Department of Transportation ("Department of Transportation") administers, through the Federal Aviation Administration, grants awarded under the AIP. As an agency of the federal government, the Department of Transportation is subject to the provisions of NEPA.

17.    Defendant Norman Y. Mineta is named here solely in his official capacity as Secretary of the Department of Transportation. In that capacity, Secretary Mineta is responsible for the administration, operations, and activities of the Department of Transportation, including the administration and approval of grants under the AIP and the agency's compliance with NEPA.

6

18.     Defendant Federal Aviation Administration ("FAA") is part of the Department of Transportation, and, as such, is subject to the provisions of NEPA.  The FAA is responsible for administering aviation programs, including the AIP, under delegation by the Secretary of Transportation.

19.     Defendant Marion Blakey is named here solely in her official capacity as Administrator of the FAA.  In that capacity, Administrator Blakey is responsible for the administration, operations, and activities of the FAA, including the administration and approval of grants under the AIP and the agency's compliance with NEPA.

## LEGAL BACKGROUND

### The Airport and Airway Improvement Act

20.     The AAIA authorizes the Secretary of the Department of Transportation to establish the AIP, a federal grant program intended to encourage the development of airports through federal funding.  49 U.S.C. §§ 47101-47131; 14 C.F.R. Part 152.  Airports that meet the eligibility requirements, as set forth in the AAIA and FAA regulations implementing the AAIA, may obtain federal funding through the AIP for airport planning and engineering and airport development projects.  The FAA administers the AIP on behalf of the Secretary of Transportation.

21.     To be eligible for a grant under the AIP, the airport sponsor must have an airport layout plan ("ALP") that has been approved by the FAA.  All ALPs and ALP revisions must be approved by the FAA.

22.     At a minimum, an ALP must show the following: the present boundaries of the airport, the location and nature of existing and proposed airport facilities (such as runways, taxiways, aprons, terminal buildings, hangars, and roads) and of their proposed modifications

and extensions, and the location of existing and proposed non-aviation areas, and of their existing improvements.

23.     For airport development grants, the airport development project for which AIP funds are being sought must be depicted on the approved-ALP.

24.     The AAIA requires the Secretary to condition approval of all AIP grants on specific "grant assurances" enumerated in the AAIA and directs the Secretary to prescribe requirements to ensure that airport sponsors will comply with those grant assurances.  49 U.S.C. § 47107(a), (g).

25.     Pursuant to the grant assurances, airport sponsors have an ongoing obligation to maintain an airport layout plan ("ALP").

26.     In addition, the AAIA and FAA regulations require that ALPs be "current" and "up to date at all times."

27.     The AIP Handbook, the FAA's guidance for administering the AIP, recognizes the need for a "current" ALP, stating:

> ALP's are the key documents for coordinating between off-airport parties, private users, the financial community, airports, local or State agencies, and Federal program offices. . . .  Adequate review and coordination of airport plans prior to FAA approval establishes the basis for use of the ALP.

AIP Handbook, FAA Order 5100.38B § 428d (May 31, 2002).

28.     The FAA's guidance provides that "ALP's are normally current for a five-year period unless major changes at the airport have been made or are planned" and that an ALP that is older than five years "may be determined to be current beyond that period without revisions if no changes have occurred or are planned and if the ALP meets current design standards."

29.     The ALP also serves as the basis for the FAA's review of planned airport development with respect to environmental impact.

30.     Prior to approving any project for an AIP grant, the FAA must conduct the appropriate level of environmental review.

31.     The FAA cannot determine whether a project proposed for an AIP grant will cause environmental impacts if the ALP submitted in support of the grant application is not current.

## The National Environmental Policy Act

32.     NEPA requires federal agencies to prepare a detailed statement, called an "environmental impact statement" or "EIS" for all proposed "major Federal actions significantly affecting the quality of the human environment."

33.     By its terms, NEPA applies to "Federal actions."

34.     The Council on Environmental Quality ("CEQ") has promulgated regulations to guide federal agencies when implementing NEPA.  The CEQ regulations define the term "action" to mean "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies."

35.     According to the CEQ regulations, "Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based" is a category of federal actions.

36.     An ALP is a plan intended to guide future development of an airport and to satisfy eligibility requirements as a condition of approval for AIP grants.

37.     Under CEQ's regulations, the FAA's approval of an ALP is a federal action subject to NEPA.

38.     The FAA has issued a detailed guidance document, the "Airport Environmental Handbook," for implementing NEPA in the context of airport related matters.

39.     Paragraph 5(a)(3) of the Airport Environmental Handbook confirms that approval of an ALP or revisions to an ALP is a "federal action" subject to the environmental review requirements under NEPA.

40.     To determine whether a federal action is a "major Federal action[] significantly affecting the quality of the human environment," the CEQ regulations and the Airport Environmental Handbook provide that the federal agency must make a determination classifying the action as one of three types of actions:

(1)     Those normally requiring an EIS.
(2)     Those requiring an environmental assessment.
(3)     Those which are normally categorically excluded.

41.     The first category, actions normally requiring an EIS, includes actions that the agency has determined are likely to have significant environmental effects.  For these actions, the FAA must prepare an EIS prior to taking final action.

42.     The Airport Environmental Handbook classifies first time ALP approval as an action normally requiring an EIS.

43.     The second category of actions are actions that the agency has determined require a case-by-case evaluation in order to determine if significant environmental effects will occur.  For such actions, the FAA must prepare an environmental assessment or "EA" to determine whether the action is likely to cause significant environmental impacts.  If the EA shows that significant impacts are likely, the FAA must prepare an EIS.

44.     The third category of actions includes actions that have been designated by the FAA as typically not resulting in significant environmental impacts.  For these actions, the FAA

may prepare a categorical exclusion or "CE," unless circumstances exist such that the action may cause significant environmental impacts.

45.     The FAA has not determined that the approval of an ALP is the type of action that may be categorically excluded.

## FACTUAL BACKGROUND

### The East Hampton Airport

46.     The East Hampton Airport is located in the Town of East Hampton, Suffolk County, New York.  The Airport is owned and operated by the Town of East Hampton New York (the "Town").  The Town is vested with independent governing authority and governed by an elected legislative body, known as the "Town Board."  The Town Supervisor is the presiding officer of the Town Board and the chief fiscal officer of the Town.

### The 1989 Master Plan Update and 1989 ALP

47.     After several years of planning and environmental review, the Town of East Hampton adopted the 1989 Airport Master Plan and 1989 ALP.

48.     As part of the planning process for the 1989 Master Plan and ALP, a comprehensive environmental impact statement ("EIS") was prepared by the Town's consultants and reviewed by the Town Board.

49.     Based on the findings in the EIS, on January 10, 1989, the Town Board passed Resolution No. 145, adopting the 1989 Master Plan with certain amendments, as set forth in the adopting resolution.

50.     The projects proposed in the 1989 Master Plan and evaluated in the EIS were grouped in two categories, Phase I and Phase II.

51.    In adopting the 1989 Master Plan, the Town Board resolved "that most, but not all Phase I improvements be adopted and implemented and that three (3) of the Phase II projects be adopted and implemented." Resolution No. 145 explained that the Town Board was adopting only the Phase I projects because the EIS had concluded that the Phase II projects would have significant adverse environmental impacts.

52.    On December 15, 1989, the Town Board passed a resolution approving the 1989 ALP and authorizing the designated Town official, Pat Trunzo, III, to sign the ALP. Mr. Trunzo signed the 1989 ALP on December 19, 1989. On December 20, 1989, the Town submitted the 1989 ALP to the FAA for approval.

<u>The 1994 ALP</u>

53.    At Defendants' request, in 1992, the Town Board commissioned C&S Engineers, Inc. ("C&S"), an engineering consulting firm hired by the Town Board to prepare an ALP update. The resulting ALP update, which was funded through an AIP grant to the Town, was completed in 1994 (the "1994 ALP").

54.    The final report on the 1994 ALP concluded that a federal environmental assessment and/or a state-level EIS would need to be undertaken to fully assess the environmental impacts associated with airport development projects not approved by the Town Board in Resolution No. 145.

55.    Upon information and belief, the Town did not commission or prepare either an environmental assessment or an EIS to examine the environmental impacts associated with any of the proposed projects depicted on or described in the 1994 ALP.

56.    Upon information and belief, FAA did not prepare any environmental analysis or document pursuant to the requirements of NEPA prior to approving the 1994 ALP.

12

57.     The Town Board never adopted or approved the 1994 ALP.  Nevertheless, the Town Supervisor signed the 1994 ALP and submitted it to the FAA for approval.

58.     By letter dated August 23, 1994, FAA approved the 1994 ALP.

59.     Based on the 1994 ALP, between 1994 and 2001, FAA awarded the Town several million dollars of financial assistance in the form of AIP grants to be used for development of the East Hampton Airport.

FAA's Invalidation of the 1994 ALP

60.     Concerned about the growth of the Airport, on April 2, 2001, the Committee notified the FAA that the 1994 ALP had never been approved by the Town Board, as required by state law.  The Committee informed the FAA of a series of state court actions brought by the Committee against the Town seeking to prevent development of the Airport in accordance with the unapproved 1994 ALP, pending a comprehensive review of the environmental impacts of the plan and formal adoption of the plan by the Town Board.  The Committee also asked the FAA to stop any federal funding of improvements shown on the 1994 ALP until the FAA conducted a NEPA analysis of that plan.

61.     Following the Committee's April 2 letter, Mr. Robert Mendez, Manager of the Airports Division for the Eastern Region of the FAA, issued a formal request to the FAA Regional Counsel seeking a legal opinion as to the legal validity of the 1994 ALP.

62.     By letter dated May 30, 2001, the Town wrote to FAA, admitting that the Town Board never approved the 1994 ALP.

63.     Nonetheless, the Town maintained that FAA should consider the 1994 ALP to be valid because the Town and the FAA had funded numerous capital improvements included on

the 1994 ALP, such as the Airport Terminal Building, the Apron Phase I Project, and the Runway 10-28 repaving and rehabilitation work.

64.     In a June 21, 2001 legal opinion memorandum, the FAA Regional Counsel concluded that the 1994 ALP is invalid because it was not properly authorized by a vote of the Town Board.

65.     The June 21 legal opinion recommended that the FAA "inform the Town that we believe the 1994 ALP to be invalid and ask that it submit a new ALP or resubmit the 1994 ALP along with a Town Board resolution adopting the ALP."

66.     The manager for FAA's New York Airports District Office ("NYADO"), Mr. Philip Brito, informed the Town of the Regional Counsel's opinion on June 29, 2001.

67.     In addition to the methods to cure the invalid 1994 ALP outlined in the Regional Counsel's opinion, the NYADO manager suggested that the Town "could take no action . . ., thereby allowing the prior ALP, which was approved by the Town Board in 1988 [sic] to become the ALP of record."

68.     Mr. Brito then informed the Town that he could not locate a copy of the 1989 ALP in the FAA files and requested that the Town send a copy of that plan to his office.

69.     In its response, dated July 10, 2001, the Town argued that the Town Board ratified the 1994 ALP when it acted to approve the new Terminal Building and reconstruction of Runway 10-28. The Town further noted that both of these projects "were significant projects with significant public debate. Moreover, both of those projects were explicitly premised on the 1994 ALP and the FAA funding which was provided each both [sic] projects was also explicitly premised on their inclusion in the 1994 ALP."

14

70.     In an undated decision paper, Mr. Brito requested authorization to accept the Town's argument that the 1994 ALP was valid because the Town had ratified the ALP by approving prior projects that were proposed and constructed under the auspices of the 1994 ALP.

71.     Subsequently, on July 20, 2001, Mr. Mendez, the FAA Regional Manager, rejected Mr. Brito's proposed decision paper.  In the July 20 determination, Mr. Mendez concluded that the 1994 ALP is invalid because it was not adopted by the Town Board.

72.     Accordingly, Mr. Mendez stated that the NYADO could not approve the Town's pending application for an AIP grant.

73.     On July 25, 2001, Mr. Brito notified the Town by letter that the 1994 ALP is invalid and that FAA could not locate within its files the ALP it had previously approved, i.e., the 1989 ALP.

74.     Mr. Brito further stated that the FAA could not consider approving the pending grant application unless "the 1994 ALP is validated by a resolution by the Town Board approving the 1994 ALP and authorizing . . . the Town Supervisor to sign and approve the ALP."

75.     The Town Board did not validate the 1994 ALP, as proposed by FAA.  Instead, on August 3, 2001, the Town Board adopted Resolution No. 1023, authorizing the Town Supervisor to "re-sign a copy of the ALP" that was approved on December 15, 1989 by Resolution No. 2020 of the Town Board, signed by the Deputy Town Supervisor (Pat Trunzo, III), transmitted to and approved by the FAA on September 5, 1990, and that the FAA subsequently advised the Town it could not locate.

## FAA's Approval of the 2001 ALP

76.     By letter dated August 7, 2001, the Town Clerk transmitted Resolution No. 1023 to Mr. Brito.  On August 8, 2001, the Town Supervisor signed an ALP (the "2001 ALP"), which then was submitted to the FAA for approval.

77.     On August 20, 2001, Mr. Brito indicated the FAA's approval of the 2001 ALP by affixing his signature to the document.

78.     In his letter transmitting the FAA-approved ALP to the Town, Mr. Brito noted that the 2001 ALP "is identical to the one approved by Town Board Resolution #2020 on December 15, 1989."

79.     In January 2003, in response to a federal grand jury investigation, the Town revealed that it had located a true copy of the 1989 ALP that was approved by Resolution No. 2020 of the Town Board, on December 15, 1989, and signed by Pat Trunzo, III on December 19, 1989.

80.     The 1989 ALP produced in January 2003 by the Town is not "identical" to the 2001 ALP, signed by the current Town Supervisor on August 8, 2001 and submitted to the FAA in August 2001 for its approval.

81.     The ALP submitted to the FAA in August 2001 did not depict the current location of existing and proposed airport facilities, such as aprons and the terminal building.

82.     The FAA approved the 2001 ALP knowing that the ALP was not current.

83.     Prior to its August 20, 2001 approval of the ALP, the FAA had provided funding for several projects at the Airport.  All of the projects were constructed prior to August 20, 2001.

16

84.     The projects constructed before August 20, 2001 included widening the primary runway, Runway 10-28, demolishing the existing Terminal Building and constructing a new Terminal Building in a new location, and reconstruction and expansion of one or more aprons.

85.     Additionally, in approving the 2001 ALP, the FAA failed to determine whether its approval was a "major Federal action[] significantly affecting the quality of the human environment."

86.     Unless the FAA makes a finding that the August 2001 ALP approval is categorically excluded, NEPA requires that the FAA prepare an EA or EIS prior to acting on the request for approval of the ALP.

87.     Upon information and belief, the FAA failed to make a determination that its approval of the 2001 ALP qualifies for a CE.

88.     Upon information and belief, the FAA also failed to prepare an EA or EIS prior to approving the ALP.

<u>COUNT I</u>

89.     Plaintiffs repeat and reallege the foregoing allegations.

90.     The AAIA directs the FAA to ensure that each airport sponsor that is a recipient of federal AIP funds complies with the continuing obligations set forth in the grant assurances contained in AIP grant agreements. The FAA must require that each airport sponsor maintain a "current" ALP.

91.     FAA guidance provides that an ALP is normally current for five years, "unless major changes at the airport have been made or are planned." FAA Order 5100.38B § 428d.

92.     In addition, FAA regulations and guidance governing the approval and use of an ALP require that the ALP, when approved, represents the existing and proposed layout of the airport and its facilities.

93.     The FAA approved the 2001 ALP knowing that the ALP was not current and that, in fact, several airport projects had been undertaken at the Airport since 1989.

94.     The FAA was aware at the time it approved the 2001 ALP that Runway 10-28 had been widened by 25 feet, that the existing Terminal Building had been demolished and a new Terminal Building had been constructed in a new location, and that an apron reconstruction and expansion project had been implemented because the FAA had provided funding for each of these improvements.

95.     In light of the changes to the Airport, which the FAA itself had reviewed and funded, the FAA's approval of the 2001 ALP was arbitrary and capricious, and in violation of 49 U.S.C. § 47107(a)(16) and its own regulations.  Accordingly, the Court should vacate the FAA's approval action.

96.     Further, the Court should enjoin the FAA from approving any projects or disbursing any funds under the AIP, until a new ALP is approved in accordance with the AAIA and the FAA's regulations and guidance.  Absent injunctive relief, Plaintiffs, who live near the Airport and are affected by airport and aircraft operations, will have no way to assess the potential impacts of the planned development of the Airport.  Plaintiffs have no adequate remedy at law and will suffer irreparable and permanent injury if not awarded relief by this Court.

## COUNT II

97.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 88.

98.   Pursuant to NEPA, CEQ regulations, and FAA guidance, prior to undertaking a federal action, the FAA must make a determination whether the proposed action requires (i) a CE, (ii) an EA, or (iii) an EIS.

99.   Approval of an ALP by the FAA is a federal action subject to NEPA.

100.   In approving the Town's 2001 ALP, the FAA failed to make any determination whether its approval of the 2001 ALP was an action requiring (i) a CE, (ii) an EA, or (iii) an EIS.

101.   The FAA's failure to make such a determination renders its approval of the 2001 ALP arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

102.   Accordingly, the Court should declare the FAA's approval action void and remand the matter to the FAA for appropriate analysis under NEPA.


## RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

1.   Declare that the FAA's approval of the Town's 2001 ALP constitutes a federal action for purposes of NEPA;

2.   Declare that the FAA's failure to undertake a review pursuant to NEPA in connection with its August 20, 2001 approval of the 2001 ALP constitutes a violation of NEPA;

3.   Declare that the FAA's August 20, 2001 decision to approve the 2001 ALP is arbitrary and capricious and not in accordance with the AAIA and the regulations implementing the AAIA;

4.   Vacate Defendants' approval of the 2001 ALP;

5.   Enjoin Defendants from approving any projects and/or awarding any AIP funds based on the 2001 ALP;

6.     Award Plaintiffs their attorneys' fees, costs, and disbursements; and

7.     Award such other and further relief as the Court may deem appropriate.

Respectfully submitted,

Andrew T. Swers AS 5547
Sheila D. Jones
Jessica O'Donnell

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000
(202) 887-4288 facsimile

590 Madison Avenue
New York, NY 10022
(212) 872-1000
(212) 872-1002 facsimile
Attorneys for Plaintiffs

Date: May 27 2003